**REESE LLP**
Carlos V. Ramirez
*cramirez@reesellp.com*
7 Skyline Drive
Hawthorne, New York 10532
Telephone: (914) 860-4994
Facsimile: (212) 253-4272

**REESE LLP**
Michael R. Reese
*mreese@reesellp.com*
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Facsimile:  (2120 253-4272

**RICE REUTHER SULLIVAN & CARROLL, LLP**
Anthony J. DiRaimondo (to be admitted *pro hac vice*)
*adiraimondo@rrsc-law.com*
3800 Howard Hughes Parkway, Suite 1200
Las Vegas, Nevada 89169
Telephone: (702) 732-9099
Facsimile: (702) 732-7110

*Counsel for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

### WHITE PLAINS DIVISION

| | |
|---|---|
| SHANNON WHITE, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>– against –<br><br>BLUE BUFFALO COMPANY, LTD.<br><br>Defendant. | Case No. 20-cv-00001<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Shannon Walton ("Plaintiff") individually and on behalf of all others similarly situated (the "Class," as defined below), by and through her undersigned counsel, bring this Class Action Complaint against Blue Buffalo Company, Ltd. ("Defendant" or "Blue Buffalo"), and respectfully alleges as follows.  Plaintiff bases the allegations herein on personal knowledge as to matters related to, and known to, Plaintiff.  As to all other matters, Plaintiff bases the allegations herein on information and belief, through investigation of Plaintiff's counsel.  Plaintiff believes substantial evidentiary support exists for the allegations set forth herein, and Plaintiff seeks a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Grey wolves are the domestic dog's genetic ancestors. Indeed, the two species are so genetically similar that they are capable of interbreeding and shared a common ancestor as recently as 10,000 years ago.  Wild wolves consume *little or no dietary carbohydrate* and they do not experience high rates of chronic diseases such as obesity and cancer. In fact, these diseases are *essentially non-existent* in wolf populations.

2.      This is a proposed class action against Defendant for marketing and labeling its so-called "Blue Wilderness" line of dog food products ("Products") as healthy, nutritious, and optimal on the basis that they are "[i]nspired by the diet of wolves" and otherwise consistent with dogs' "ancestors in the wild." Defendant's Blue Wilderness packaging prominently displays an image of a grey wolf and promotes these products as "Nature's Evolutionary Diet." Defendant's Blue Wilderness products are more expensive than many other pet foods, but Defendant claims that the extra cost is justified for these health and evolutionary-based diet reasons. But Defendant's claims are deceptive because their Blue Wilderness products all contain *high levels of dietary carbohydrates*, which are neither healthy for dogs nor a meaningful part of the diet of grey wolves.

3.      Specifically, dietary carbohydrates are more fattening for dogs than other macronutrients. As such, carbohydrates are the fundamental cause of obesity, a chronic disease with clearly-established links to morbidity in dogs.  And while this disease was virtually non-existent among wolf populations, American dogs are currently experiencing an epidemic of

1

obesity, with studies suggesting that at least 50% of dogs in the United States are overweight.

4.      Carbohydrate consumption also causes canine blood glucose levels to spike. Unfortunately, glucose is the preferred metabolic fuel of renegade cancer cells. Like obesity, cancer is another chronic disease with clear links to morbidity in dogs. And, just like with obesity, this chronic disease was also virtually non-existent among their wolf ancestors, but domestic dogs in the United States are currently experiencing an epidemic of cancer, with the disease thought to afflict at least 25% of American dogs.

5.      Carbohydrate consumption also exacerbates the metabolic disorder diabetes. Just like with humans, high levels of blood glucose are toxic to dogs and can quickly become deadly. In healthy animals, the hormone insulin serves to "clear" glucose from the bloodstream after a carbohydrate-rich meal by shunting glucose molecules into fat tissue and skeletal muscle. Diabetic dogs cannot produce enough insulin to perform this crucial function effectively. Accordingly, their owners must monitor blood glucose levels carefully and inject their pets with costly exogenous insulin supplements any time a carbohydrate-rich meal is consumed.  Dietary carbohydrates are broken down into glucose molecules during digestion. As such, carbohydrate-rich meals cause profound blood glucose spikes while carbohydrate-restricted meals induce far less significant changes (if any). Millions of dogs in the United States -- the vast majority of whom eat carbohydrate-rich kibbles like the ones sold by Defendant -- suffer from diabetes. But among wolves -- a species that never consumes carbohydrates -- there has never been a single documented case.

## PARTIES

### Plaintiff Shannon Walton

6.      Plaintiff Shannon Walton is a resident of Hopewell Junction, New York, and she has no intention of changing her residence.

7.      Plaintiff Walton is the owner of a seven-year-old labrador-beagle mix named Tucker.  Based on Defendant's marketing and labeling that represent its product as healthy and consistent with the diet of grey wolves, Plaintiff Walton purchased for Tucker the dog food known as BLUE Wilderness™ Rocky Mountain Recipe (Red Meat flavor) and BLUE Wilderness™ Rocky Mountain Recipe (Bison flavor).

8.      As a result of consuming Defendant's product as described above, Tucker has gained significant weight and now requires medical attention for canine obesity.  Tucker has also been diagnosed with diabetes, which has caused Plaintiff to incur out-of-pocket costs for treatment.

### Defendant Blue Buffalo

9.      Defendant Blue Buffalo Company, Ltd.  is a corporation organized under the laws of Delaware.  Defendant's principal place of business is located in Wilton, Connecticut.

## JURISDICTION AND VENUE

### Jurisdiction

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed Class are in excess of $5,000,000, exclusive of interest and costs, and Plaintiff, as well as most members of the proposed Classes, which total more than 100 class members, are citizens of a state different from the state of Defendant.  This Court has personal jurisdiction over Defendant for reasons including but not limited to the following: Plaintiff Walton's claims against Defendant arise out of Defendant's conduct within New York, including but not limited to the marketing and sale of Defendant's dog food within the State of New York. Furthermore, Defendant purposefully avails itself of the privilege of conducting business activities within the territorial boundaries of New

3

York, including by marketing, distributing, and delivering its dog food and other products to New York, including New York residents, thus invoking the benefits and protections of the laws of New York, and such activities render it foreseeable that Defendant may be haled into court in this jurisdiction. Thus, Defendant has sufficient minimum contacts with New York that maintenance of this action in this Court does not offend traditional notions of fair play and substantial justice.

**Venue**

11.     Venue is proper in the White Plains Division of the Southern District of New York, as the actions and harms alleged herein occurred, in part, in that judicial district.

**ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

12.     Defendant is a leader in the pet food industry, which in the United States alone grossed more than $29 billion in revenue during 2018.

13.     Defendant manufactures and markets for sale to the public a number of pet food products for both dogs and cats.  Defendant's dog food products include, but are not limited to, certain product lines described by Defendant as "BLUE Wilderness™".

14.     Despite Defendant's claims on its packaging that Blue Buffalo foods are "Healthy" and "Holistic," the fact remains that the majority of Defendant's dog food products are dry, "kibble"-style foods produced via extrusion processing, a manufacturing method which typically requires a high amount of carbohydrate-containing ingredients that are not healthy for dogs.

15.     Specifically, extrusion processing is a manufacturing process whereby pet food ingredients are mixed in a mixer, extruded through an extruder barrel, cut into various shapes and sizes, and then dried in an oven, ultimately producing hard, shelf-stable nuggets or "kibbles."  Due to the comparatively low costs of carbohydrate-containing ingredients and their functional utility in binding other ingredients together during extrusion processing, among other reasons, Defendant's extruded dog food products are all high in carbohydrate content.

16.     For instance, Defendant's Blue Wilderness Chicken recipe dry dog food, which Defendant's packaging touts as "protein-rich," and "High-Protein" is composed of over 25%

4

carbohydrate.  As such, a small bowl of Defendant's Blue Wilderness Chicken recipe dog food contains more carbohydrate than a wild grey wolf is likely to consume in *an entire lifetime.*

17.     Not only are Defendant's Blue Wilderness products high in carbohydrate content, but the high carbohydrate content of the products is hidden from consumers. Unlike most food products, the carbohydrate content of Defendant's Blue Wilderness dog food product *is not disclosed* on any of Defendant's product labels.  Instead, Defendant markets and promotes its dog food products by focusing on the non-carbohydrate nutrients found in the products, such as proteins, fats, fiber, vitamins and minerals.   Nor is the carbohydrate content disclosed on Defendant's website. In order to determine the carbohydrate content of Defendant's products, consumers must either contact Defendant's customer service department or perform the complicated and painstaking task of calculating the carbohydrate content by backing out the percentages of the disclosed nutritional information from the sum of ingredients. Because of the deceptive nature of Defendant's packaging, consumers would be forgiven for believing that Defendant's Blue Wilderness products contain little or no carbohydrate. But they would be wrong.

18.     With respect to the disclosed ingredients, Defendant's packaging touts that they are formulated in a way that makes Defendant's dog food healthier than other dog foods.  For example, Defendant's Blue Wilderness packaging touts that its ingredients are present in the food in some kind of "unique," "precise," "optimal," or "healthy and holistic" way.   The packaging also claims that Defendant's dry dog food is formulated to provide dogs with "superior nutrition" and "a healthy lifestyle."

19.     Defendant also markets its high-carbohydrate dog food products through claims about the positive effects those products will have on the canine body, usually referencing specific physiological outcomes. For example, on its packaging for Blue Wilderness products, Defendant states that its dry dog food products will provide dogs, "Healthy Muscle Development," "Energy for an Active Life," "Strong Bones & Teeth," "Joint Health," "Healthy Skin & Coat," and a "Healthy Immune System."

20.     Just like with its consumer marketing, Defendant markets and promotes its high-

5

carbohydrate dog food products to veterinarians through claims about the positive effects those products will have on the canine body, usually referencing specific physiological outcomes similar to those described above.

21.     In one way or another, all of the marketing claims described above fail to reflect the scientifically-verified reality about the health effects that dietary carbohydrates have on the bodies of domestic dogs.

22.     In reality, the scientific record clearly shows that domestic dogs did not begin consuming carbohydrates until at least 99% of their genetic evolution as a canine species was complete. Their wild ancestors lacked the ability to digest carbohydrates efficiently for hundreds of millions of years.  And their close genetic cousins, wild grey wolves, still do not consume any carbohydrates. In other words, from the perspective of evolutionary biology, carbohydrates are not a very "natural" part of a canine diet.

23.     Despite this fact, Defendant's Blue Wilderness™ dry dog food's packaging, which prominently displays a photograph of a grey wolf, touts it as being "Nature's Evolutionary Diet." The packaging further states that the food that was "[i]nspired by the diet of wolves, tireless hunters whose endurance is legendary, [and that] BLUE Wilderness is sure to satisfy your dog's inner carnivore."

24.     Unlike the other macronutrients (fats and proteins) and all manner of micronutrients, dogs do not require any dietary carbohydrates whatsoever in their diets in order to avoid the development of diseases of deficiency and otherwise maintain good health. This fact is recognized both by the National Academies of Sciences, Engineering, and Medicine ("NASEM"), and the Association of American Feed Control Officials ("AAFCO"), the two most prominent and authoritative bodies to produce consensus statements concerning the nutritional requirements of dogs and cats.

25.     Indeed, the majority of peer-reviewed scientific studies to have examined the issue have found that, calorie-for-calorie, dietary carbohydrates are more fattening for dogs than other macronutrients.  These studies suggest that carbohydrates play an outsize role in causing obesity,

a chronic disease with clearly established links to morbidity in dogs.  Domestic dogs in the United States are currently experiencing an epidemic of obesity, with the disease thought to afflict at least 50% of American dogs.

26.     The majority of peer-reviewed scientific studies to have examined the issue have also found that dietary carbohydrates induce unique metabolic and hormonal changes in dogs that other nutrients do not cause to any significant degree.  Among other important changes, the consumption of carbohydrates causes circulating glucose levels to rise, which in turn causes the secretion of the anabolic hormone insulin. Among other metabolic changes, elevated insulin levels cause dogs to metabolize glucose to a greater degree (than other metabolic substrates such as free fatty acids) and to retain more glucose within the adipose tissue (i.e., "get fatter").

27.     The majority of peer-reviewed scientific studies to have examined the issue have also found that renegade cancer cells preferentially metabolize glucose to fuel their furious growth rates. Because consumption of dietary carbohydrates directly leads to elevated glucose levels, this fact has led numerous veterinary oncologists to employ carbohydrate restriction, among other dietary interventions, to help prevent and treat cancer in domestic dogs. Cancer is a chronic disease with clear links to morbidity in dogs. Just like with obesity, domestic dogs in the United States are currently experiencing an epidemic of cancer, with the disease thought to afflict at least 25% of American dogs.

28.     By contrast, as noted above, wild wolves consume little or no dietary carbohydrate. And despite their genetic similarity, unlike dogs, grey wolves do not experience high rates of chronic diseases such as obesity and cancer. In fact, these diseases are essentially non-existent in wolf populations.

29.     Carbohydrate consumption also exacerbates the metabolic disorder diabetes. Just like with humans, high levels of blood glucose are toxic to dogs and can quickly become deadly. In healthy animals, the hormone insulin serves to "clear" glucose from the bloodstream after a carbohydrate-rich meal by shunting glucose molecules into fat tissue and skeletal muscle. Diabetic dogs cannot produce enough insulin to perform this crucial function effectively. Accordingly, their

owners must monitor blood glucose levels carefully and inject their pets with costly exogenous insulin supplements any time a carbohydrate-rich meal is consumed.  Dietary carbohydrates are broken down into glucose molecules during digestion. As such, carbohydrate-rich meals cause profound blood glucose spikes while carbohydrate-restricted meals induce far less significant changes (if any). Millions of dogs in the United States -- the vast majority of whom eat carbohydrate-rich kibbles like the ones sold by Defendant -- suffer from diabetes. But among wolves -- a species that never consumes carbohydrates -- there has never been a single documented case.

30.    As the self-touted pet food company that "set a new standard in healthy pet food" and who worked alongside "a leading holistic veterinarian and animal nutritionist" to develop "the #1-selling natural pet food in America," Defendant knew or should have known that:

a.    the scientific record clearly demonstrates that domestic dogs did not consume significant quantities of carbohydrates until at least 99% of their evolution as a canine species was complete, and that modern-day grey wolves (the domestic dog's close genetic cousin) continue to avoid carbohydrates entirely;

b.    dogs do not require dietary carbohydrates in order to maintain good health, as recognized by the NASEM and the AAFCC, the two most prominent and authoritative bodies to produce consensus statements concerning the nutritional requirements of dogs and cats;

c.    dietary carbohydrates are not an essential nutrient for dogs nor are they otherwise required to maintain good health;

d.    the majority of peer-reviewed scientific studies show that dietary carbohydrates are more fattening for dogs than any other macronutrient; and

e.    the majority of peer-reviewed scientific studies show links between dietary carbohydrates, and metabolic irregularities, obesity, and cancer in dogs.

31.    Plaintiff and other members of the Class reasonably and justifiably relied on Defendant's false, misleading, and fraudulent conduct when deciding to purchase Defendant's

Blue Wilderness dog food products.

32.     Plaintiff and members of the Class suffered injuries caused by Defendant because they would not have purchased the products or would have paid significantly less for the products, had they known that Defendant's conduct was false, deceptive and misleading.

## CLASS ACTION ALLEGATIONS

33.     Plaintiff brings this case as a class action that may be properly maintained under Federal Rule of Civil Procedure 23 on behalf of herself and all persons in the state of New York, who within the relevant statute of limitations periods, purchased the Products (the "Class" or "New York Class").

34.     Excluded from the Class are Defendant, the officers and directors of the Defendant at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendant has or had a controlling interest.  Any judge and/or magistrate judge to whom this action is assigned and any members of such judges' staffs and immediate families are also excluded from the Class.  Also excluded from the Class are persons or entities that purchased the Products for purposes of resale.

35.     Plaintiff hereby reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery.

36.     Plaintiff is a member of the Class.

37.     Numerosity:  Defendant has sold tens of thousands of units of the Products. Defendant's Products are available for sale through third party retailers and vendors (including online), such as Petco, Petsmart, and Amazon.  Accordingly, members of the Class are so numerous that their individual joinder herein is impractical.  While the precise number of class members and their identities are unknown to Plaintiff at this time, the number may be determined through discovery.

38.     Common Questions Predominate:  Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual class members. Common legal and factual questions include, but are not limited to, the following: whether Defendant's representations were false and misleading, and therefore violated various consumer protection statutes and common laws.

39.     Typicality:  Plaintiff's claims are typical of the claims of the Class she seeks to represent in that Plaintiff and members of the Class were exposed to the same or substantially

10

similar false and misleading advertising, purchased the Products relying on the false and misleading advertising, and suffered losses as a result of such purchases.

40.    Adequacy:  Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the members of the Class she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of the members of the Class will be fairly and adequately protected by the Plaintiff and his counsel.

41.    Superiority:  A class action is superior to other available means for the fair and efficient adjudication of the claims of the members of the Class.  The size of each claim is too small to pursue individually and each individual Class member will lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.   Individualized litigation also presents a potential for inconsistent or contradictory judgments.  The class action mechanism is designed to remedy harms like this one that are too small in value, although not insignificant, to file individual lawsuits for.

42.    This lawsuit is maintainable as a class action under Federal Rule of Civil Procedure 23(b)(2) because Defendant has acted or refused to act on grounds that are generally applicable to the class members, thereby making final injunctive relief appropriate with respect to all Class.

43.    This lawsuit is maintainable as a class action under Federal Rule of Civil Procedure 23(b)(3) because the questions of law and fact common to the members of the Class predominate over any questions that affect only individual members, and because the class action mechanism is superior to other available methods for the fair and efficient adjudication of the controversy.

## CLAIMS

## FIRST CLAIM FOR RELIEF

### Violation of New York General Business Law Section 349
### (*On Behalf of the New York Class*)

44.     Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

45.     Plaintiff brings this claim for violation of New York General Business Law section 349 against Defendant on behalf of the New York Class.

46.     By engaging in the actions, misrepresentations, and misconduct set forth herein, Defendant committed unfair and deceptive acts and practices in the conduct of its business, trade and commerce in New York.

47.     The foregoing deceptive acts and practices were directed at Plaintiff and members of the New York Class.

48.     Defendant's false and misleading representations regarding the Products are material to a reasonable consumer because they relate to the contents and characteristics of the Products purchased by the consumer. A reasonable consumer would attach importance to the representations and would be induced to act thereon in making Product purchase decisions.

49.     Plaintiff and members of the New York Class where injured as a direct and proximate result of Defendant's violations described above, as they would not have purchased the Products or would have paid significantly less for the Products, had they known Defendant's representations were false, misleading, and fraudulent.

50.     On behalf of herself and the other members of the New York Class, Plaintiff seeks both to enjoin Defendant's deceptive and unlawful acts and practices described herein, and to recover her actual damages, or fifty dollars per purchase, whichever is greater, as well as three times actual damages and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

### Violation of New York General Business Law Section 350
### (*On Behalf of the New York Class*)

51.     Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

52.     Plaintiff brings this claim for violation of New York General Business Law section 350 against Defendant on behalf of the New York Class.

53.     By engaging in the actions, misrepresentations, and misconduct set forth herein, Defendant has engaged and continues to engage in false advertising in the conduct of its business, trade, and commerce in New York.

54.     The false and misleading representations were directed at consumers and were likely to mislead a reasonable consumer acting reasonably under the circumstances.

55.     Defendant's false and misleading representations with respect to the Products are material to a reasonable consumer because they relate to the contents and characteristics of the Products purchased by the consumer. A reasonable consumer would attach importance to the representations and would be induced to act thereon in making purchase decisions.

56.     The false and misleading representations have resulted in consumer injury or harm to the public.

57.     Furthermore, Plaintiff and members of the New York Class where injured as a direct and proximate result of Defendant's violations described above, as they would not have purchased the Products or would have paid significantly less for the Products, had they known Defendant's representations were false, misleading, and fraudulent.

58.     On behalf of herself and other members of the New York Class, Plaintiff seeks both to enjoin Defendant's misleading and unlawful acts and practices described herein and to recover actual damages or five hundred dollars per violation (whichever is greater), three times actual damages, and reasonable attorneys' fees.

13

## THIRD CLAIM FOR RELIEF

**Breach of Quasi-Contract/Unjust Enrichment/Restitution under New York Law**
***(On Behalf of the New York Class)***

59.     Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

60.     Plaintiff brings this claim for breach of quasi-contract/unjust enrichment/restitution under New York law against Defendant on behalf of the New York Class.

61.     Defendant intentionally and recklessly made false and misleading representations about the Products to Plaintiff and the members of the Classes to induce them to purchase the Products. Plaintiff and the members of the Classes reasonably relied on the misleading representations and have not received all of the benefits promised by Defendant. Plaintiff and the members of the Classes therefore have been induced by Defendant's misleading representations about the Products, and paid for them when they would and/or should not have, or paid more money to Defendant for the Products than they otherwise would and/or should have paid.

62.     Defendant has obtained benefits from Plaintiff and the other Class members by fraud, and Defendant would obtain an undue advantage if allowed to retain the monetary benefits it received from them on account of its false and misleading representations.

63.     The monies Defendant received were obtained under circumstances that were at the expense of Plaintiff and the members of the New York Class—i.e., Plaintiff and the other Class members did not receive the full value of the benefit conferred upon Defendant.

64.     Therefore, it is inequitable and unjust for Defendant to retain the profit, benefit, or compensation conferred upon it without paying Plaintiff and the other members of the Class back for the difference of the full value of the benefit compared to the value actually received.

65.     As a direct and proximate result of Defendant's unjust enrichment, Plaintiff and other members of the Class seek restitution, disgorgement, and/or the imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendant from its deceptive, misleading, and unlawful conduct as alleged herein.

14

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the members of the Class, respectfully requests the Court to enter an Order:

A.      certifying the proposed Classes under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), as set forth above; naming Plaintiff as representative of the Class; and naming Plaintiff's counsel as Class Counsel to represent the Class;

B.      declaring that Defendant is financially responsible for notifying the Class members of the pendency of this suit;

C.      declaring that Defendant has committed the violations of law alleged herein;

D.      providing for any and all injunctive relief the Court deems appropriate;

E.      awarding statutory damages in the maximum amount for which the law provides;

F.      awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

G.      providing for any and all equitable monetary relief the Court deems appropriate;

H.      awarding punitive or exemplary damages in accordance with proof and in an amount consistent with applicable precedent;

I.      awarding Plaintiff her reasonable costs and expenses of suit, including attorneys' fees;

J.      awarding pre- and post-judgment interest to the extent the law allows; and

K.      providing such further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff demands a trial by jury on all issues so triable.

Date: January 1, 2020                    Respectfully submitted,

                                    **REESE LLP**

                          By:  */s/ Michael R. Reese*                              
                               Michael R. Reese
                               *mreese@reesellp.com*
                               100 West 93rd Street, 16th Floor
                               New York, New York  10025
                               Telephone: (212) 643-0500
                               Facsimile: (212) 253-4272

                               **REESE LLP**
                               Carlos V. Ramirez
                               *cramirez@reesellp.com*
                               7 Skyline Drive
                               Hawthorne, New York 10532
                               Telephone: (914) 860-4994
                               Facsimile: (212) 253-4272

                               **RICE REUTHER SULLIVAN & CARROLL, LLP**
                               Anthony J. DiRaimondo (to be admitted *pro hac vice*)
                               *adiraimondo@rrsc-law.com*
                               3800 Howard Hughes Parkway, Suite 1200
                               Las Vegas, Nevada 89169
                               Telephone: (702) 732-9099
                               Facsimile: (702) 732-7110

                               *Counsel for Plaintiff and the Proposed Class*